# United States Court of Appeals
## For the First Circuit

No. 07-1783

CLAUDIA CECILIA RESTREPO RUIZ ET AL.,

Petitioners,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE BOARD

OF IMMIGRATION APPEALS

Before

Lipez, <u>Circuit Judge</u>,
Selya, <u>Senior Circuit Judge</u>,
and Stahl, <u>Senior Circuit Judge</u>.

<u>Daniel F. Cashman</u>, <u>Cashman & Lovely, P.C.</u>, and <u>Susanna L. Shafer</u> on brief for petitioners.
<u>Jeffrey S. Bucholtz</u>, Acting Assistant Attorney General, Civil Division, <u>Terri J. Scadron</u>, Assistant Director, Office of Immigration Litigation, and <u>Wendy Benner-León</u>, Trial Attorney, Office of Immigration Litigation, on brief for respondent.

May 21, 2008

**SELYA**, **Senior Circuit Judge**. The lead petitioner, Claudia Cecilia Restrepo Ruiz, is a Colombian national.[1] She seeks review of a final order of the Board of Immigration Appeals (BIA) rejecting her request for asylum. She argues that the BIA erred in its determination that she failed to establish either past persecution or an objectively reasonable fear of future persecution on account of a statutorily protected ground. Concluding, as we do, that the BIA's decision is supported by substantial evidence in the record, we deny the petition.

## I.  BACKGROUND

The petitioner entered the United States with her three children on November 22, 2001. That entry reunited her with her husband, Jorge Iván Marín Grisales (Marín), who had entered the United States two years earlier and had overstayed the term authorized by his nonimmigrant visa.

On May 20, 2002 — one day prior to the expiration of her authorized stay — the petitioner filed an omnibus application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). After a preliminary investigation, the authorities commenced removal proceedings under 8 U.S.C. § 1227(a)(1)(B).

---

[1]The lead petitioner's husband and their three children are also listed in the petition. Because their claims are wholly derivative, we treat the case as if the lead petitioner was the lone petitioner.

On June 2, 2003, the petitioner appeared with counsel before an immigration judge (IJ). She conceded removability but pressed forward with her omnibus application. Over the course of a two-day hearing, the petitioner, her husband, and one child testified about what they characterize as "harassment, threats, and mistreatment" at the hands of the Revolutionary Armed Forces of Colombia (FARC). Because the IJ deemed this testimony credible, we rehearse the facts as limned therein.

In 1985, when the petitioner was approximately sixteen years of age, armed FARC guerillas visited her father's farm, demanded financial support for their operations, and tried to recruit her family to their cause. Notwithstanding the FARC's reputation for hard-core violence (such as assassinations, kidnapings, and forced recruitments), the petitioner's father refused these demands. The guerillas burned down the family farm at a substantially later date (some six months after the family had decided to abandon it). The petitioner viewed this as an act of retaliation.

Several years thereafter, the petitioner joined Colombia's Conservative Party. As a party member, she occasionally participated in a "community civic group" that helped organize political gatherings and recruit new adherents. Her main activities, however, involved teaching people how to sew.

In 1994, the petitioner found herself transporting political propaganda for the party. Guerillas stopped the car in which she was riding. They torched the vehicle, destroying the pamphlets, and warned her that her life would be at risk if she did not desist from partisan political activities. The petitioner took these imprecations to heart and refrained from further political involvement.

Marín (the petitioner's husband) had a separate series of encounters with the FARC. The most notable of those occurred on June 12, 1999. As he, his brother, and one of his sons were driving home, a group of guerillas who had kidnaped a young woman stopped their vehicle. The kidnapers' car was mired in a ditch, so they demanded a ride from Marín at gunpoint.

Marín complied, but he became convinced that the kidnapers knew his identity. His fears were heightened when a guerrilla said that he "knew him" from town. Before departing, the guerillas recorded his license plate number and warned him that he and his family would be in jeopardy if he told the authorities about what had transpired.

Marín also testified that he feared persecution by the FARC on account of his prior service in the Colombian army. He failed, however, to offer any evidence that the trepidation was justified; he retired from the army in 1980, and could not link the occurrence of any untoward event to his past military service.

On June 29, 1999, Marín obtained a visa to visit the United States and began scaling back his business in preparation for his departure. He characterized his decision to leave Colombia as a response to the hijacking incident. Around this same time, the family started to receive telephone calls demanding money. Notwithstanding the hijacking, the threatening calls, and his possession of a visa, Marín remained in Colombia. It was not until November 20, 1999, after receiving a note from the FARC demanding that he meet with the guerillas and pay a bribe relating to his business, that Marín emigrated to the United States, leaving his wife and children behind.

The petitioner testified that her own (subsequent) decision to flee was precipitated by the abduction of her brother-in-law (Marín's brother) during the following year. Drawing upon a newspaper article that she proffered to corroborate her version of that event, she reported that the victim was kidnaped, along with several other persons, by FARC guerillas who were targeting a wealthy landowner.

At the conclusion of all the evidence, the IJ denied the petitioner's claim for asylum.[2]  He concluded that (i) the past

---

[2]The IJ also denied the petitioner's claims for withholding of removal and CAT relief.  Because the petition for judicial review focuses single-mindedly on asylum, we make no further mention of the other two claims.  See Rotinsulu v. Mukasey, 515 F.3d 68, 71 (1st Cir. 2008) (explaining that issues not briefed in the court of appeals are deemed abandoned).

events recounted by the witnesses failed to rise to the level of persecution, (ii) there was no plausible basis for an objectively reasonable fear of future persecution, and (iii) the petitioner had failed to demonstrate that the mistreatment of which she complained (whether past or anticipated) was causally connected to a statutorily protected ground. The BIA affirmed the IJ's ukase. This timely petition for judicial review followed.

## II. DISCUSSION

Before us, the petitioner presses only her asylum claim. See supra note 2. Our review is focused on the BIA's decision. See Orelien v. Gonzales, 467 F.3d 67, 70 (1st Cir. 2006). If, however, the IJ's findings are incorporated into the BIA's decision, we also examine those findings. Thus, where "the BIA conducts a de novo review of the record, independently validates the sufficiency of the evidence, and adopts the IJ's findings and conclusions, the IJ's findings become the BIA's." Laurent v. Ashcroft, 359 F.3d 59, 64 n.3 (1st Cir. 2004). This is such an instance.

With respect to past persecution, the petitioner asserts that the BIA relied too heavily upon the absence of physical harm and neglected to give weight to the historical pattern of mistreatment suffered by the petitioner and her family. In addition, she asserts that the BIA erred in its assessment of her fear of future persecution because it focused exclusively on her

-6-

political affiliation and discounted her membership in a particular social group (namely, an anti-FARC family).

Our odyssey begins with a précis of the standard of review. Absent an error of law, we must uphold the BIA's denial of an asylum petition as long as that denial is supported by substantial evidence in the record as a whole. See Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005). That standard requires us to defer to the BIA's findings of fact "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). This is not a petitioner-friendly standard of review; a reversal is appropriate only when the record evidence "points unerringly" to a conclusion different from that reached by the BIA. Laurent, 359 F.3d at 64.

Although we afford de novo review to the BIA's legal determinations, its construction of the Immigration and Nationality Act (INA) and the regulations thereunder is entitled to a degree of deference. See Da Silva v. Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005); see also Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

With this prelude, we turn to the petitioner's assignments of error. In order to qualify for asylum, an alien must demonstrate that she is a "refugee" within the meaning of the INA. See 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a); see also Makhoul v. Ashcroft, 387 F.3d 75, 79 (1st Cir. 2004). To carry

-7-

this burden, the alien must prove that she is unable or unwilling to repatriate "because of persecution . . . on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see Orelien, 467 F.3d at 70.

An alien may make the requisite showing through one of two avenues. The first requires her to demonstrate past persecution on account of one of the five statutorily protected grounds, thereby triggering a rebuttable presumption of future persecution. Makhoul, 387 F.3d at 79. Once that presumption emerges, the burden shifts to the government to prove that she can return safely to her homeland. See Orelien, 467 F.3d at 71; see also 8 C.F.R. § 208.13(b)(1)(i)(A)-(B) (setting forth what the government must then prove).

The second avenue requires an independent showing, unaided by any presumption, of a well-founded fear of future persecution based on a statutorily protected ground. Makhoul, 387 F.3d at 79. That showing has both a subjective and an objective component; that is, the professed fear must be not only genuine but also objectively reasonable. Orelien, 467 F.3d at 71. That objective component must be "nestled on a plausible factual predicate." Id. This necessitates a showing that "a reasonable person in the asylum applicant's circumstances would fear persecution on account of a statutorily protected ground."

-8-

Aguilar-Solís v. INS, 168 F.3d 565, 572 (1st Cir. 1999).  No matter which avenue an alien chooses to traverse, she also must demonstrate a causal connection: that the persecution, whether past or feared, was or is "on account of" one of the five statutorily protected grounds.  8 U.S.C. § 1101(a)(42)(A).

In this venue, the petitioner emphasizes the putative connection between the alleged persecution and her membership in a particular social group.  The key integer in the "social group" equation is "whether the claimed persecution is aimed at an individual because of his or her affiliation with a group of persons, all of whom share a common, immutable characteristic." Da Silva, 394 F.3d at 5.  So viewed, membership in such a group must stem from an innate characteristic or a shared experience. Ang v. Gonzales, 430 F.3d 50, 55 (1st Cir. 2005).  In either event, the common link must be one that people "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences."  Da Silva, 394 F.3d at 5 (citation and internal quotation marks omitted).

Against this backdrop, we consider whether the BIA erred when it ruled that the petitioner had not carried the devoir of persuasion on the issue of past persecution.  On this point, the petitioner's challenge has two foci.  First, she contends that the BIA overemphasized the absence of physical harm.  Second, she contends that the BIA neglected to look closely enough at her

family's collective history of claimed persecution.  We address these contentions separately.

The INA provides no specific definition of the term "persecution."  In light of this lacuna, we have concluded that what constitutes persecution is a question best answered on a case-by-case basis.  See, e.g., Orelien, 467 F.3d at 71.  Due to the "nearly infinite diversity of factual circumstances in which asylum claims arise, it would be difficult to develop meaningful generalities that could easily be applied to a broad spectrum of cases."  Bocova, 412 F.3d at 263 (citing Aguilar-Solís, 168 F.3d at 569-70).

This does not mean, however, that we are rudderless on a sea of speculation.  To the contrary, the case law reveals significant channel markers.  For example, we repeatedly have held that an alien's experiences must add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment. See, e.g., Orelien, 467 F.3d at 71; Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005); Bocova, 412 F.3d at 263.

Examining the record in this case, we discern substantial support for the BIA's conclusion that the petitioner failed to cross that threshold.  Here as in other cases, see, e.g., Zheng v. Gonzales, 416 F.3d 97, 100 (1st Cir. 2005), we find it significant that neither the petitioner nor her family were ever arrested or detained for any extended period of time.  Here as in other cases,

see, e.g., López de Hincapie v. Gonzales, 494 F.3d 213, 219 (1st Cir. 2007), we find it significant that the threats about which the witnesses testified were not connected with any statutorily protected ground but, rather, were clearly motivated either by greed or by a desire to elude the authorities.

The BIA's emphasis on the absence of any physical harm was entirely appropriate: the fact that nobody in the family was physically harmed in any of the described encounters constitutes a pertinent datum that is deserving of weight. See, e.g., Susanato v. Gonzales, 439 F.3d 57, 60 (1st Cir. 2006). This is, in a sense, a case of addition by subtraction; the absence of evidence of physical harm plainly supports the BIA's determination that nothing tantamount to persecution transpired.

The petitioner's asseveration that the BIA relied too heavily upon the absence of evidence of physical harm starts from a correct premise: an applicant for asylum is not obliged to show the infliction of physical harm in order to carry her burden of proving past persecution. See, e.g., Un v. Gonzales, 415 F.3d 205, 210 (1st Cir. 2005) (noting that threats alone could be enough to establish past persecution). But the presence or absence of physical harm (and, indeed, the degree of harm inflicted) remains a relevant factor in determining whether mistreatment rises to the level of persecution. Alibeaj v. Gonzales, 469 F.3d 188, 191-92 (1st Cir. 2006); Orelien, 467 F.3d at 71.

-11-

In all events, the petitioner's argument ignores the fact that the IJ's findings, adopted in pertinent part by the BIA, cite a number of relevant considerations above and beyond the absence of physical harm. Moreover, the petitioner ignores that the negative finding as to past persecution was doubly justified because she had failed to establish that any alleged mistreatment, whether or not productive of physical harm, was "on account of" a statutorily protected ground. These oversights are independently sufficient to doom the petitioner's challenge.

The petitioner's charge that the BIA did not consider her family's history of persecution is likewise unpersuasive. For one thing, the record makes manifest that both the IJ and the BIA canvassed all the evidence and considered the petitioner's allegations as a whole. For another thing, the petitioner never succeeded in weaving her family's narrative into anything resembling a pattern of systematic mistreatment. Nothing in the record suggests — let alone compels — a conclusion that the unfortunate experiences undergone by the petitioner and her family were more than isolated occurrences, unrelated to family membership.

To be sure, it is possible that the BIA could have teased out of the evidence something resembling a pattern of persecution. But that is not enough to profit the petitioner. Given two plausible but conflicting inferences from a body of evidence, the

-12-

BIA's choice between those inferences is by definition supported by substantial evidence. See Aguilar-Solís, 168 F.3d at 571 (choosing among reasonable but competing inferences is the "factfinder's prerogative").

This leaves the petitioner's plaint that the BIA erred in failing to find a well-founded fear of future persecution. In undertaking this foray, the petitioner suggests that the BIA (and the IJ, for that matter) overlooked that her fears were based not only on political activism but also on her membership in a targeted social group (her family). This suggestion is theoretically sound but factually unsupported.

Kinship can be a sufficiently permanent and distinct characteristic to serve as the linchpin for a protected social group within the purview of the asylum laws. See Gebremichael v. INS, 10 F.3d 28, 36 (1st Cir. 1993). Withal, to ground a viable asylum claim, that family membership must be at the root of the persecution, so that family membership itself brings about the persecutorial conduct. Id. at 35.

In the case at hand, the BIA found an absence of persecution, and the record contains no evidence capable of compelling the opposite finding. Certainly, it is not enough merely to show that multiple members of a single family had negative experiences. Those experiences would, at the very least,

have to rise to the level of persecution and be causally linked to family membership. The record here falls short on both points.

In an effort to blunt the force of this reasoning, the petitioner maintains that the guerillas' recognition of Marín during the hijacking shows that they knew the family and intended to target family members because of their anti-FARC leanings. That scenario requires a huge helping of sheer surmise — and the BIA was not obligated to accept it as fact. See Pulisir v. Mukasey, ___ F.3d ___, ___ (1st Cir. 2008) [No. 07-1356, slip op. at 10] (noting that "[t]he mere fact that those decisionmakers weighed the constituent parts [of a petitioner's proffer] differently and reached a conclusion not to the petitioner's liking does not constitute a valid reason for overturning the agency's judgement"). While one of the hijackers might have recognized Marín, the implied threat voiced by the guerillas can best be classified as an attempt to ensure Marín's silence, not as part of a vendetta against a particular family.[3]

The petitioner's insinuation that the family was targeted because of Marín's military service is made up out of whole cloth. There is not a shred of evidence that any family member was harassed on account of Marín's tour of duty in the army — a tour

___

[3]In this regard, the petitioner also mentions her brother-in-law's kidnaping. However, there is no evidence that her brother-in-law was kidnaped due to family membership or any other statutorily protected ground.

that concluded years before any of the incidents of alleged persecution occurred.

**III.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we deny the petition for review.


**So Ordered**.