# United States Court of Appeals
## For the First Circuit

No. 13-2022

ELVIS LEONEL ALDANA-RAMOS; ROBIN OBDULIO ALDANA-RAMOS,

Petitioners,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for petitioners.
Stuart F. Delery, Assistant Attorney General, Civil Division, Song Park, Senior Litigation Counsel, and Sunah Lee, Trial Attorney, Office of Immigration Litigation, on brief for respondent.

June 27, 2014

**LYNCH, <u>Chief Judge</u>**.  Petitioners Elvis Leonel Aldana Ramos ("Elvis") and Robin Obdulio Aldana Ramos ("Robin") seek review of an order of the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  The BIA concluded that the petitioners had not made the requisite showings that they were or will be persecuted on account of membership in a protected social group or that it is more likely than not that they would be tortured by government authorities upon returning to their home country.  Because the BIA's conclusion as to the asylum claim is legally flawed and is not supported by the record as currently developed, we grant the petition in part and remand to the BIA for further proceedings as to the asylum and withholding of removal claims.  We deny the petition as to the CAT claim.

I.

We recount the facts as presented by the record, noting that the Immigration Judge ("IJ") found that petitioners were credible.  Elvis and Robin are brothers and are natives and citizens of Guatemala.  At the time of the relevant events, Elvis was 20 years old and Robin was 18.  Their father, Haroldo Aldana-Córdova ("Haroldo"), owned a successful used car business and a real estate rental business in Salamá, Guatemala.  Elvis and Robin worked with their father in the family business.  The family was

relatively well-off and was able to travel to the United States on vacation.

On February 4, 2009, Haroldo asked Elvis and Robin to attend to certain ongoing used car and property rental business concerns while he showed a rental apartment to potential tenants in another town. Both Elvis and Robin were to meet with a buyer interested in purchasing a truck, and Elvis was later supposed to show a rental property to potential tenants. Elvis later called Haroldo to tell him that the buyer was interested in purchasing a truck from the dealership, but there was no answer on Haroldo's phone. Elvis left Robin to conclude the truck sale while he went to show the apartment. Soon after, an unknown person approached Robin at the dealership and told him that Haroldo had been kidnapped for ransom. Robin called Elvis, who immediately went to the police station to report the kidnapping. According to the petitioners, the police took no real action on the kidnapping report. Elvis and Robin later learned that the kidnappers belonged to a group known as the "Z" gang, a well known criminal organization in Guatemala with ties to drug trafficking.

On February 5, Haroldo called Elvis and Robin and told them that his kidnappers demanded one million quetzales (approximately $125,000) in ransom by noon of that day and would kill him if they did not pay the entire ransom. The next day, Haroldo called again to repeat the message. Haroldo instructed

Elvis and Robin to pawn the car dealership to Marlon Martínez, a family friend and business associate.[1]  Martínez already owed Haroldo's family 150,000 quetzales but he did not help them raise the ransom money.

Over the next three days, Elvis and Robin collected 400,000 quetzales and paid it to the kidnappers.  The kidnappers continued to refuse to release Haroldo until the ransom was paid in full.  Around that same time, men in vehicles without license plates began driving around petitioners' home.  The brothers found the action intimidating.  According to an affidavit Elvis later submitted, this was a threatening tactic frequently used by the "Z" gang.

Eventually, Elvis and Robin borrowed the remaining 600,000 quetzales, largely from relatives, and paid the sum over to the kidnappers.  The brothers state that they completely exhausted their financial resources in doing so.  The kidnappers told the brothers where they could retrieve their father.  When they arrived at that location, they could not find him.  Nor did he turn up.  Four days later, the police called Elvis and told him Haroldo had been murdered and his body had been found in a different town.

---

[1]  The record is not entirely clear regarding Martínez's profession, but it appears that he was a sort of lender who would buy or offer mortgages on distressed properties at high margins. In the United States, he might be called a loan shark.

After Haroldo's murder, several members of the "Z" gang were arrested and charged with the killing. One of those members was Marlon Martínez, Jr., the son of Haroldo's business associate. The brothers eventually learned that the Martínez family was involved in the entire kidnapping and intimidation ordeal. The charges against all of the suspects were eventually dropped; Elvis testified that the reason the charges were dropped was that the judge was paid off.

Although Haroldo was dead and the ransom paid, the threats against petitioners resumed. About a month after Haroldo's funeral, Elvis was followed from the dealership by a car with no license plates, which he recognized as one of the same cars that had earlier circled his house. In fear, Elvis abandoned his car and fled on foot after evading the follower. To keep Robin safe, Elvis sent him to stay with their aunt in a different town, about four hours away from their home. Elvis eventually joined them, after receiving continuing threats from unmarked cars. Elvis had taken to traveling to work at odd hours, using different vehicles with tinted windows. Eventually, unmarked cars began appearing at petitioners' aunt's house. On one occasion, she saw several heavily armed men get out of the cars and circle the house as if they were looking for someone.

By mid-2009, the brothers fled to the United States. Robin entered on a tourist visa on March 3, 2009, and Elvis entered on a tourist visa on July 5, 2009.

On February 5, 2010, petitioners filed their timely application for asylum and withholding of removal. Petitioners argued that they were persecuted on account of their membership in a particular social group, which they defined as their immediate family. The case was referred to the Immigration Court for removal proceedings.

An IJ heard the case in January 2012. The IJ found that petitioners' testimony was credible, noting that it "was internally consistent and consistent as well with the detailed written statement that they each offered in support of their applications." The IJ went on to deny their applications "for failure to make a nexus between the past persecution that they claim on account of [their] membership in their nuclear family and any of the enumerated grounds." The IJ explained that "the social group claimed does not meet the requirements of particular social visibility and . . . that, rather, the respondents' family has been a victim of criminal activity in the country of Guatemala." The IJ also denied the application under the CAT, finding that petitioners made "no claim that they would be tortured by the government of Guatemala if returned to that country."

Petitioners appealed to the BIA. The BIA affirmed, adopting the IJ's decision and supplementing it with its own findings. Specifically, the BIA concluded that "[t]he evidence shows that criminals kidnapped the respondents' father to obtain money from him and his family[;] it does not demonstrate that the harm [they] suffered in Guatemala was on account of their race, religion, nationality, membership in a particular social group, or political opinion." It further concluded that "[t]he respondents did not demonstrate that Marlon Martínez . . . or Mr. Martínez's son was associated with the 'Z' gang or that they sought to harm the respondents for any reason including on account of a protected ground."[2] The BIA concluded that although Haroldo was certainly the victim of "a terrible crime," the crime was motivated by the "Z" gang's perception of his wealth "and not on account of a protected characteristic of the respondents' father or of their family." Elvis and Robin timely petitioned this court for review.

---

[2] With respect to the relationship between Martínez's son and the "Z" gang, the IJ explicitly found that the parties "responsible" for the kidnapping and murder were the "Z" gang and Martínez's son. This finding is reversible by the BIA only if it is "clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). The joint criminal responsibility for the events at issue gives rise to a strong inference that there was some relationship between Martínez's son and the "Z" gang. Absent a holding by the BIA that the IJ's finding was clearly erroneous or some explanation rebutting this inference, the BIA's conclusion that there was no association is not supported by the record.

II.

Where the BIA adopts an IJ's decision and supplements the decision with its own findings, as here, we review the decisions of both the BIA and the IJ. See Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004). We must uphold the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)) (internal quotation marks omitted); accord Sam v. Holder, ___ F.3d ___, 2014 WL 1910962, at *1 (1st Cir. May 14, 2014). "To reverse the BIA['s] finding we must find that the evidence not only supports [a contrary] conclusion, but compels it . . . ." Elias-Zacarias, 502 U.S. at 481 n.1. We review the BIA's legal conclusions de novo, although we grant some deference to its interpretations of statutes and regulations related to immigration matters. Matos-Santana v. Holder, 660 F.3d 91, 93 (1st Cir. 2011).

To qualify for asylum, petitioners must establish that they are "refugee[s]." 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 1208.13(a). A refugee is "someone who is unable or unwilling to return to his home country due to persecution or a well-founded fear of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Silva v. Gonzales, 463 F.3d 68, 71 (1st Cir. 2006) (quoting 8 U.S.C. § 1101(a)(42)(A)).

-8-

The IJ's conclusion turned entirely on whether petitioners had established a sufficient "nexus" between their claimed persecution and the particular social group -- that is, whether they were persecuted "on account of" their family membership.[3] The BIA's opinion likewise focused on the "on account of" element. Because understanding petitioners' claimed social group and persecution is necessary to determining whether the persecution was "on account of" membership in the social group, we address each of these elements in turn. We do so bearing in mind the Supreme Court's instruction that the "ordinary . . . rule" is to remand to the BIA to allow it to make case-specific determinations in the first instance. I.N.S. v. Orlando Ventura, 537 U.S. 12, 18 (2002).

A.      Particular Social Group

In this case, petitioners argue that they are members of a "particular social group," which they define as their immediate family. It is well established in the law of this circuit that a

---

[3] The IJ did make a stray reference to "social visibility" -- that is, the requirement that a particular social group must be identifiable, see Larios v. Holder, 608 F.3d 105, 108-09 (1st Cir. 2010); Gebremichael v. I.N.S., 10 F.3d 28, 36 (1st Cir. 1993) -- but offered no specific factual findings or legal rationales to explain why petitioners' family could not be a particular social group on that basis. In its brief, the government encourages us to characterize the "thrust" of the IJ's decision to focus on the conclusion "that Petitioners failed to establish a nexus between what had happened to them and their father . . . and a statutorily protected ground," not that their family could not be a "particular social group."

nuclear family can constitute a particular social group "based on common, identifiable and immutable characteristics." <u>Gebremichael</u> v. <u>I.N.S.</u>, 10 F.3d 28, 36 (1st Cir. 1993); <u>see</u> <u>Ruiz</u> v. <u>Mukasey</u>, 526 F.3d 31, 38 (1st Cir. 2008) ("Kinship can be a sufficiently permanent and distinct characteristic to serve as the linchpin for a protected social group within the purview of the asylum laws."). And we are not aware of any circuit that has reached a contrary conclusion.[4]

Although the record is not entirely clear, the BIA appears to have concluded in this case that a family cannot qualify as a particular social group unless a member of the family (or, perhaps, the family itself) can also claim another protected ground. Specifically, the BIA stated: "[T]he 'Z' gang was motivated by criminal intent to misappropriate money from the respondents' father <u>and not on account of a protected characteristic of the respondents' father or of their family</u>." (emphasis added).[5] The law in this circuit and others is clear that a family may be a particular social group simply by virtue of

---

[4] A strand of cases within the Ninth Circuit held that a family could never be a particular social group, but those cases were overruled by the en banc court. <u>See</u> <u>Thomas</u> v. <u>Gonzales</u>, 409 F.3d 1177, 1180 (9th Cir. 2005) (en banc), <u>vacated on other grounds</u>, 547 U.S. 183 (2006).

[5] The BIA also elaborated later: "The respondents' broad claim that they were persecuted on account of their membership in a particular social group, which they define as their own nuclear family, <u>without more</u>, is inadequate to show the required nexus for asylum and withholding of removal." (emphasis added).

-10-

its kinship ties, without requiring anything more. See Gebremichael, 10 F.3d at 35-36 & n.20 (explaining that a family may be a particular social group and that, although social group membership often overlaps with other protected grounds, "social group persecution can be an independent basis of refugee status"); see also Ruiz, 526 F.3d at 38 (explaining that asylum claim can succeed where "family membership itself brings about the persecutorial conduct"); Thomas v. Gonzales, 409 F.3d 1177, 1188-89 (9th Cir. 2005) (en banc) ("[T]here is nothing in the statute . . . to suggest that membership in a family is insufficient, standing alone, to constitute a particular social group in the context of establishing eligibility for asylum or withholding of removal."), vacated on other grounds, 547 U.S. 183 (2006); Iliev v. I.N.S., 127 F.3d 638, 642 (7th Cir. 1997) (requiring petitioner to "demonstrate that his family was a particular target for persecution" without requiring showing of additional protected ground).

Our interpretation is consistent with the language of the statute. As the BIA has explained, there is no indication that Congress intended the phrase "membership in a particular social group" to have any particular meaning, and Congress borrowed the term directly from the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223. See In re Acosta, 19 I. & N. Dec. 211, 232 (B.I.A. 1985). A "purely linguistic analysis of this ground" shows that it can encompass

-11-

"persecution seeking to punish either people in a certain relation, or having a certain degree of similarity, to one another or people of like class or kindred interests," including based on "family background."  Id. at 232-33.  And although this ground "may frequently overlap with persecution on other grounds such as race, religion, or nationality," id. at 233, there is no indication in the text that it must overlap.

The factual record here does not preclude and would even allow the BIA to find that petitioners are members of a particular social group by virtue of their family relationship, without any need to show a further protected ground.  We express no opinion on whether such a finding is compelled by the record or whether petitioners' family in particular meets the criteria for a particular social group, leaving the issue to the BIA in the first instance.  See Orlando Ventura, 537 U.S. at 18.

B.        Persecution

Next, petitioners argue that they were persecuted in Guatemala.  They recount the series of crimes committed against their family: the kidnapping, ransom, and murder of their father; intimidation using unmarked vehicles during the kidnapping period; resumed intimidation in the same manner after their father's death; and the appearance of unmarked cars and heavily armed men at their aunt's house four hours away.  Additionally, petitioners point to

their own testimony, which the IJ concluded was credible, that they fear they will be killed if they are sent back to Guatemala.

Whether a set of experiences rises to the level of persecution is decided on a case-by-case basis, Raza v. Gonzales, 484 F.3d 125, 129 (1st Cir. 2007), although "[t]o rise to the level of persecution, the sum of an alien's experiences must add up to more than ordinary harassment, mistreatment, or suffering," Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007). "[T]hreats of murder would neatly fit under this carapace." Lopez de Hincapie, 494 F.3d at 217. This case includes far more than mere threats of murder.[6] And other circuits have held that factual scenarios very similar to this one did rise to the level of persecution. See Tapiero de Orejuela v. Gonzales, 423 F.3d 666, 672-73 (7th Cir. 2005) (finding persecution against wealthy family where paramilitary group followed them, murdered father, demanded money, and threatened remaining family members).

The government attempts a recharacterization of the facts. It argues that "there were no 'threats' [against

---

[6]    Cf. Reyes Beteta v. Holder, 406 F. App'x 496, 498-99 (1st Cir. 2011) (finding no persecution on the basis that applicant was a child at the time of relatives' murders and did not remember them, that murderers were unknown and so no motive or nexus to protected ground could be established, and that petitioner was not followed when he moved to a farm outside of the city). The facts here are easily distinguishable from Reyes Beteta: petitioners were adults at the time of their father's murder, knew which group was responsible for the murder, were harassed afterward, and were followed to a town four hours away.

-13-

petitioners after their father's death] because the people [in the unmarked cars] never approached or spoke to Elvis or anyone at his aunt's house."  We disagree.  No reasonable factfinder could so interpret the facts here.  Petitioners testified credibly that the unmarked cars were subjectively intimidating, that they were a common intimidation tool used by the "Z" gang, and that heavily armed men got out of the vehicles at their aunt's house and walked around the property, when that had never happened before.  If the government intends a rule that there is no persecution or even threats where threats are not verbalized, it is wrong as a matter of law.  Cf. Un v. Gonzales, 415 F.3d 205, 209-10 (1st Cir. 2005) (recognizing the possibility of "implicit" death threats and that those threats, taken in context with other hostile actions including more explicit threats, could support a finding of persecution).  The fact that no words were exchanged does not mean those actions were not threatening.

"Persecution also 'always implies some connection to government action or inaction,' whether in the form of direct government action, 'government-supported action, or government's unwillingness or inability to control private conduct.'" Ivanov v. Holder, 736 F.3d 5, 12 (1st Cir. 2013) (quoting Sok v. Mukasey, 526 F.3d 48, 54 (1st Cir. 2008)).  Here, petitioners offered evidence of such a connection: they testified to their belief that the murder charges were dismissed because the local judge was paid off.

-14-

They also testified that the police were unwilling or unable to investigate the "Z" gang's activities, particularly the kidnapping. And they were found credible.

The BIA never addressed whether this testimony established the necessary connection between petitioners' experiences and the Guatemalan government's unwillingness or inability to control private conduct. We leave the question to the BIA on remand but observe that this testimony would at least allow such a finding.

For these reasons, we conclude that the record does not preclude but permits the BIA to find that persecution occurred here. We again express no opinion as to whether such a finding is compelled on this record. See Orlando Ventura, 537 U.S. at 18.

C.     "On Account Of"

The final element of the asylum claim, and the most contested in this case, is whether the BIA applied the correct analysis to determine whether petitioners were persecuted "on account of" their membership in their family. Both the BIA and the IJ concluded that petitioners had not drawn a sufficient connection between their membership in their nuclear family and the criminal actions taken against them. The BIA concluded that the "Z" gang "targeted [Haroldo] because they believed he was a wealthy person, . . . and not on account of a protected characteristic of the

respondents' father or of their family."  This conclusion, of course, is directed toward Haroldo and not toward the petitioners.

Petitioners argue that this focus on Haroldo fails to account for their own claims.  They make two further arguments that the BIA's conclusion entirely misses the focus of what the family as a particular social group means.  First, and most importantly, they argue that the BIA's conclusion that petitioners were targeted on the basis of wealth is unsupported by the record.  Petitioners point to their credible testimony that they exhausted all of their own and their family's financial resources in trying to raise the money to ransom their father, and yet were still followed by members of the "Z" gang in unmarked cars even after their father's funeral.  That testimony creates an inference that the "Z" gang targeted petitioners because of their membership in a particular (and perhaps somewhat prominent) family.

Neither the BIA nor the IJ ever addressed this argument. That is insufficient.  We see no support in this record for the BIA and IJ's conclusions that petitioners were targeted based solely on their family's wealth, as that conclusion is directly at odds with the strong inference from petitioners' credible testimony.[7]

---

[7]  In its brief, the government suggests that the BIA could infer that the "Z" gang subjectively believed that petitioners still had access to more money.  That approach, not articulated by the BIA, fails for three reasons.  First, there is nothing in the record whatsoever to support the inference; such a conclusion would be based on pure speculation.  Second, the record actually suggests that the "Z" gang did know about petitioners' true financial

Independently, petitioners also correctly point out that asylum is still proper in mixed-motive cases even where one motive would not be the basis for asylum, so long as one of the statutory protected grounds is "at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i). In other words, even though criminal targeting based on wealth does not qualify as persecution "on account of" membership in a particular group, see Sicaju-Diaz v. Holder, 663 F.3d 1, 3-4 (1st Cir. 2011), the statute still allows petitioners to claim asylum if petitioners' family relationship was also a central reason for the persecution against them.

The BIA, however, concluded that because the initial crimes were at least partly motivated by wealth, none of the persecution against petitioners could have been based on a protected ground. Specifically, the BIA explained:

> The respondent's [sic] father was a victim of a terrible crime in Guatemala by the "Z" gang who targeted him because they believed he was a wealthy person. Thus, the "Z" gang was motivated by criminal intent to misappropriate money from the respondents' father and not on account of a protected characteristic of respondents' father or of their family.

---

situation, since the "Z" gang witnessed directly the difficulty petitioners had in gathering the ransom money even in the face of an immediate death threat against their father. Moreover, there is evidence of a connection between the "Z" gang and Marlon Martínez's son; Martínez likely knew of the petitioners' financial situation because they approached him to sell the car dealership. Finally, even if this inference were plausible on this record, the BIA never actually drew the inference.

It is unclear whether the BIA intended a general rule to this effect or meant that on these facts, the existence of a wealth motive forecloses the possibility of a protected ground. In either case, we are aware of no legal authority supporting the proposition that, if wealth is one reason for the alleged persecution of a family member, a protected ground -- such as family membership -- cannot be as well. To the contrary, the plain text of the statute, which allows an applicant to establish refugee status if the protected ground is "at least one central reason" for the persecution, clearly contemplates the possibility that multiple motivations can exist, and that the presence of a non-protected motivation does not render an applicant ineligible for refugee status. See 8 U.S.C. § 1158(b)(1)(B)(i).

To be sure, if wealth is the sole reason for targeting a group of people, the fact that the group is a family unit does not convert the non-protected criminal motivation into persecution on the basis of family connections. See Perlera-Sola v. Holder, 699 F.3d 572, 577 (1st Cir. 2012).[8] Each case depends on the facts.

---

[8] Likewise, a personal vendetta against individuals, even if they are a family group, does not rise to the level of persecution "on account of" family membership if the risk of harm "aris[es] solely out of a personal dispute." Costa v. Holder, 733 F.3d 13, 17 (1st Cir. 2013); see also Vasiliu v. Ashcroft, 123 F. App'x 12, 13 (1st Cir. 2005) (explaining that evidence showed only a personal vendetta, not persecution on account of a protected ground); cf. Ruiz, 526 F.3d at 38 (recognizing that a vendetta "against a particular family" for reasons other than mere personal antipathy may establish persecution on account of family membership).

There may be scenarios in which a wealthy family, targeted in part for its wealth, may still be the victims of persecution as a family. For instance, a local militia could single out a prominent wealthy family, kidnap family members for ransom, effectively drive the family into poverty, and pursue them throughout the country in order to show the local community that even its most prominent families are not immune and that the militia's rule must be respected. That is one of a number of examples.

In this case, we leave to the BIA the question of whether the family relationship was, in addition to wealth, a central factor behind the persecution. At this stage in the proceedings, we simply observe that the record is more than sufficient to allow such a finding.[9]

III.

The BIA also rejected petitioners' claim for CAT protection. A petitioner seeking CAT protection must show "it is more likely than not" that he would be subject to torture "by or with the acquiescence of a government official." Nako v. Holder,

---

[9] The record shows that all members of petitioners' family that the record identifies as living in Guatemala at the relevant time were targeted by the "Z" gang: Haroldo, both petitioners, and their aunt. That distinguishes this case from those past decisions in which we held that petitioners had not proven persecution "on account of" their family membership in part because other members of their family in the country were not being persecuted. See, e.g., Dias Gomes v. Holder, 566 F.3d 232, 234 (1st Cir. 2009); Ruiz, 526 F.3d at 37; see also Escobar-Hernandez v. Holder, 473 F. App'x 785, 785 (9th Cir. 2012).

611 F.3d 45, 50 (1st Cir. 2010).  As the BIA noted, there is no evidence of government acquiescence here.  According to petitioners' testimony, and in contrast to their description of police inaction following the kidnapping, the police did investigate their father's murder and made arrests in the case. The only evidence that could arguably be construed to show government acquiescence in the "Z" gang's activities was Elvis's testimony that the judge who released the suspects had been paid off, but petitioners have made no showing that similar bribery would likely occur in a future case.  Without a showing of government participation or acquiescence, petitioners' claim for CAT protection fails.

IV.

The BIA's decision as to petitioners' asylum claim was not supported by substantial evidence because it neglected the evidence in support of petitioners' claim and was based on a legal error because it did not allow for the possibility of mixed motives.  The decision as to the CAT claim, on the other hand, was supported by substantial evidence.  Consequently, the petition for review is granted in part and denied in part.  We vacate the BIA's decision as to the asylum and withholding of removal claims and remand for further proceedings consistent with this opinion.

So ordered.