BARRON, Circuit Judge, concurring in part and dissenting in part.
I join the majority in rejecting Rosa Maria Villalta-Martinez's challenge to the denial of her claim under the Convention *27 Against Torture. See 8 C.F.R. § 1208.16. I cannot, however, join the majority's decision to uphold the Board of Immigration Appeals' (BIA) determination that her asylum application must be rejected, too.
The main question on which our review of the BIA's asylum ruling turns is a relatively narrow one. After all, the majority agrees, as do I, that the threats that Villalta-Martinez received from a notorious gang in her home country of El Salvador were serious enough to rise to the level of persecution. Thus, the key point of dispute concerns whether we may sustain the BIA's determination that Villalta-Martinez failed to establish the connection between those threats and her claimed familial ties to the father of her child that she was required to establish in order to satisfy what is known as the "nexus" requirement. See Ivanov v. Holder, 736 F.3d 5, 12 (1st Cir. 2013). For, if the BIA's determination regarding the "nexus" requirement may be sustained, then Villalta-Martinez's petition for review must be denied, even if there is merit to her separate challenge to the determination below that she failed to establish that her home country's government was unwilling or unable to address the threat that the gang posed to her.
We are, of course, obliged to sustain the BIA's ruling on the "nexus" issue if it is supported by "substantial evidence." Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005). But, we may do so only on the basis of "the record considered as a whole." Id. (internal quotation marks omitted). And here, notwithstanding the majority's contrary conclusion, see Maj. Op. at 23-24, I do not see how we can.
As I will explain, neither the BIA nor the Immigration Judge (IJ), whose findings the BIA adopted, addressed (or even mentioned) the potentially significant countervailing evidence in the record that suggests that Villalta-Martinez was targeted-at least in part-due to her familial ties to the father of her child (a child who was born in the United States and is thus a citizen of this country). Accordingly, consistent with the teaching of Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 197, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947), and the course that we followed in Aldana-Ramos v. Holder, 757 F.3d 9, 18 (1st Cir. 2014), I would vacate the BIA's ruling as to Villalta-Martinez's asylum claim and remand for further proceedings.[5] And that is because, as I will also explain, once the "nexus" ruling is set aside, there is no other ground on which we may uphold the BIA's affirmance of the IJ's ruling denying her asylum petition.[6]
I.
With respect to the "nexus" issue, I start by reviewing the key evidence that the IJ and the BIA failed to address, which consists of the testimony that Villalta-Martinez *28 gave at her asylum proceeding and which the IJ found to be credible. I then explain why, under our precedent, the IJ's and the BIA's failure to address this evidence precludes us from sustaining the agency's "nexus" ruling.
A.
Villalta-Martinez explained in her testimony that, while she was living in El Salvador but before she was first threatened by the gang, she worked at a store owned by Ever Eliseo Garcia Linares (Garcia), with whom she lived at the time and who is the father of her child. She further testified that Garcia owned a number of stores in El Salvador and that he was paying protection money to a particular gang, the Marasalvatrucha, so that his stores would not be robbed.
Villalta-Martinez explained that, after Garcia fled El Salvador to avoid having to pay off the gang, members of that same gang began to threaten her at the store, even though she had never been personally threatened by members of that gang before. And Villalta-Martinez went on to describe how she eventually moved to a different one of Garcia's stores in order to escape the gang but that the threats from members of that gang did not stop. Rather, she recounted, members of the gang that Garcia had been paying off, and that had threatened her at the first store after he had left the country, simply followed her to that new store and threatened her there.
Villalta-Martinez also testified that each time the gang members came into this second store while she was working there, they "demande[ed] money from the store and then they demanded directly money from me." Villalta-Martinez added that the gang targeted her at that store because she "was the partner of the owner of the store[.]" In fact, she went on to note that she could not have been targeted by the gang members at this store because she had money, as she testified that she had none.
To be sure, Villalta-Martinez did testify that she was not the only store employee whom the gang members threatened. But that acknowledgement hardly suffices to demonstrate that the gang members did not target her "on account of" her ties to Garcia. Even if the gang members were clearly interested in acquiring money from those they threatened at the stores, we have long recognized that "asylum is still proper in mixed-motive cases even where one motive would not be the basis for asylum, so long as one of the statutorily protected grounds is 'at least one central reason' for the persecution." Aldana-Ramos, 757 F.3d at 18 (quoting 8 U.S.C. § 1158(b)(1)(B)(i) ) (emphasis added). Thus, notwithstanding this aspect of Villalta-Martinez's testimony, the gang members may have been partly motivated to target Villalta-Martinez because of her ties to Garcia as his "partner" despite the fact that they also may have wanted money from the store or its employees.
Significantly, the government in cross-examining Villalta-Martinez never challenged her contention that the gang members threatened her, at least in part, because of her relationship with Garcia and not solely in order to obtain money either from her or from the store. That is perhaps because, the record indicates, the government failed to realize that she intended to argue, based on her testimony as to her living arrangement with Garcia and her child with him, that she was part of a family with Garcia for the purposes of establishing her membership in a "social group."
In fact, after Villalta-Martinez completed her testimony, the government initially *29 argued that the IJ should deny the asylum claim on the ground that "girlfriends of shop owners in El Salvador" did not constitute a cognizable "social group" under the asylum statute, thereby rendering the "nexus" issue beside the point insofar as the government's "social group" argument had merit. The government made no argument at that point in the asylum proceedings that the gang members' threats were not partly motivated by, as Villalta-Martinez had testified, the fact that she was Garcia's "partner."
The government shifted course, however, after Villalta-Martinez's counsel clarified that the petitioner's asserted "social group" was the family that Villalta-Martinez claimed to have established with Garcia. The government at that point argued for the first time that Villalta-Martinez's testimony was insufficient to demonstrate the required "nexus" between the threats that she received and her ties to Garcia.
By then, though, the government had done nothing to undermine the portions of Villalta-Martinez's testimony in which she had asserted, credibly, that the gang had not only threatened her at the first store where she had been working but also had gone on to follow her to the second of Garcia's stores. Nor had the government done anything as of that point to undermine her testimony that the gang members directly targeted her there because she was Garcia's "partner." Nor, finally, had the government done anything by that point to undermine Villalta-Martinez's contention in her testimony that she had no money of her own at the time that she was so targeted.
Thus, as the case comes to us, the record contains uncontradicted, credible testimony from Villalta-Martinez that would appear to give rise to an inference that the gang's threats were motivated at least to some extent by her claimed familial ties to Garcia. Nevertheless, in finding that Villalta-Martinez had failed to meet her burden to satisfy the "nexus" requirement, neither the IJ nor the BIA discussed (or even referenced) any of the portions of her testimony that I have just described.
The IJ simply concluded summarily and categorically that "the evidence was not that [Villalta-Martinez] was targeted because of Mr. Garcia, but that she was targeted by gangs each and every time because they wanted money." (Emphasis added.) The BIA similarly stated in conclusory and categorical fashion that there "is insufficient evidence in the record to demonstrate that the gang members were or would be motivated to harm the response [sic] for any other reason than to extort money from her." (Emphasis added.) And, in doing so, the BIA claimed to be adopting the opinion (and thus the findings) of the IJ.
B.
The key question, then, is whether these rulings on the "nexus" issue may be sustained despite the BIA's and IJ's failure even to mention-let alone to explain away-the evidence that Villalta-Martinez offered that potentially would support her main argument as to why the record showed that there was a "nexus" between the gang members' threats and her membership in a statutorily protected "social group." And the answer to that question, as I will explain, is that, in light of our decision in Aldana-Ramos, these "nexus" rulings may not be sustained.
In Aldana-Ramos, the petitioners premised their asylum claims on the ground that the harm that they had suffered at the hands of a gang in Guatemala was "on account of" of their ties to their father and thus their membership in a protected "social group." Id. at 13-14. They contended *30 that this group was their nuclear family. Id. at 13. The BIA rejected that contention. Id. at 18.
The petitioners contended on appeal in Aldana-Ramos that the BIA erred in two ways in so ruling. The petitioners argued that the BIA had wrongly concluded that, even if they showed that their familial ties to their father were "at least one central reason" why they were targeted by the gang, those ties could not satisfy the "nexus" requirement because the petitioners had not shown that their father had been targeted by the gang based on a statutorily protected ground. See id. at 18. The petitioners also argued that the BIA's ruling that wealth alone explained their targeting by the gang "was unsupported by the record," given that the petitioners had credibly testified that they had "exhausted all of their own and their family's financial resources in trying to raise the money to ransom their father [from the gang]," but continued to be "followed by [gang] members ... even after their father's funeral." Id. And, to back up that contention, the petitioners pointed to their testimony that "unmarked cars" followed them after their father's funeral, although we did not say in Aldana-Ramos that the petitioners had claimed in their testimony that the petitioners knew who precisely was in those cars, that the persons in the cars said anything to indicate why they were following the petitioners, or that the persons in the cars knew that the petitioners had exhausted all of their financial resources. Id. at 13.
We then ruled for the petitioners on both of their asserted grounds for overturning the BIA's "nexus" ruling. Id. at 19. We explained that the BIA had erred by failing to consider the possibility that the "nexus" requirement could have been satisfied by a showing that the gang members were partly motivated to target the petitioners due to their familial ties to their father, even if the petitioners' wealth also played a role in their being targeted by the gang and even if their father had not himself been targeted for any reason other than his wealth. Id. We also separately explained that the BIA's "nexus" finding that the petitioners' wealth alone explained the targeting could not be sustained, even under the deferential substantial evidence standard. Id. And we did so because we explained that the BIA had overlooked the critical evidence regarding the unmarked cars and the petitioners' having exhausted their financial resources paying for their father's ransom, given that this evidence sufficed to create an inference of family-based targeting that the BIA was obliged to address. Id. at 18-19.
In light of Aldana-Ramos's separate substantial evidence holding, I see no justification for reaching a different conclusion with respect to whether substantial evidence supports the BIA's "nexus" ruling in this case. Here, too, the asylum seeker has put forth credible testimony that creates at least an inference of a "nexus" between the harm that she suffered and her ties to a person whom she claims is a family member. Here, too, that evidence takes the form of the asylum seeker's credible testimony that she was followed by the gang that menaced her even after she took steps to protect herself from it and that the gang members sought her out in particular because of her ties to the person she claims to be a family member. Here, too, the asylum seeker contends that these threats were directed at her by the gang even though she had no money to hand over to the gang. And yet, here, too, the BIA (like the IJ) failed to address or even mention that evidence of family-status-based targeting in concluding that the evidence showed that the asylum seeker had not been harmed "on account of" her familialties *31 and that instead she had been targeted solely for financial reasons.
In concluding that, despite the seeming similarities between Aldana-Ramos and this case, Aldana-Ramos is not controlling, the majority offers two grounds for drawing a distinction. But I am not persuaded by either one.
First, the majority rightly points out that in Aldana-Ramos, unlike in this case, the BIA refused to acknowledge the possibility that the "nexus" requirement may be satisfied by showing that the perpetrators of threats had mixed motives, only one of which was to target the asylum-seekers on account of their membership in a statutorily protected group (namely, the nuclear family that they shared with their father). Id. at 18 ; Maj. Op. 24-25. But, as noted above, Aldana-Ramos also ruled, wholly apart from that legal error, that the BIA's "nexus" ruling that wealth alone explained the petitioners' targeting could not be sustained because that ruling was not supported by substantial evidence. Id. And Aldana-Ramos came to that separate conclusion about whether substantial evidence supported the "nexus" ruling precisely because the BIA at no point addressed the portions of the petitioners' testimony concerning the men in the unmarked cars and the petitioners' own lack of financial resources that gave rise to an inference that the petitioners were targeted by the gang due to their familial ties to their father. Id. Thus, Aldana-Ramos's recognition that the BIA made a legal error concerning whether motives may be mixed does nothing to diminish the relevance to the case before us of Aldana-Ramos's independent ruling rejecting the BIA's substantial evidence ruling for failing to account for countervailing evidence of family-based targeting.
Second, the majority contends that Aldana-Ramos is distinguishable because the evidence of family-based targeting was much more compelling there than it is here, as Villalta-Martinez's evidence of such targeting in the end amounts to little more than her own speculation about the gang members' motives. Maj. Op. 24-25. But, even if the evidence of family-based targeting is weaker in this case than it was in Aldana-Ramos, the key point is that the evidence in this case is still strong enough to "create[ ] an inference" of family-based targeting that the BIA must actually address. 757 F.3d at 18 ; see also id. at 14 n.2 ("Absent a holding by the [agency] ... or some explanation rebutting this inference," the agency's conclusion cannot be upheld).
Villalta-Martinez credibly testified that she was singled out by the Marasalvatrucha gang because she was Garcia's partner. She also testified that she knew that Garcia had been subjected to threats by that same gang while she was already working at his store. It thus hardly requires a great inferential leap to conclude from her credible testimony as to these points that she had a more than conjectural basis for believing that the gang members who she testified targeted her knew of her ties to Garcia when they followed her to a second of Garcia's stores and then directly targeted her there after having targeted other store employees.[7]
*32 Moreover, whether one agrees or not with that assertion, in upholding the BIA's ruling on the ground that Villalta-Martinez's evidence of family-based targeting amounts merely to her own speculation and thus does not suffice to show the required "nexus," the majority is not relying on any finding that the BIA or the IJ, whose findings the BIA purported to adopt, actually made. Neither the BIA nor the IJ even mentioned the evidence of family-based targeting on which Villalta-Martinez primarily relied, let alone explained that such evidence was too speculative.
Nor do the "speculation" cases on which the majority relies, see Maj. Op. 24-25, indicate that we must infer that the BIA and the IJ rejected Villalta-Martinez's testimony that she was targeted because she was Garcia's partner on the ground that such evidence was too speculative. None of those cases concerned remotely comparable evidence of family-based targeting to that put forward by Villalta-Martinez, and thus it is by no means clear that the BIA or the IJ would have been required to find the evidence too speculative.[8]
Finally, I note that the government, in the part of its brief addressing the "nexus" issue, does not reference any of the "speculation" cases on which the majority relies to sustain the "nexus" rulings. Nor does the government even argue-as the majority now posits-that the reason that Villalta-Martinez's evidence of family-based targeting does not suffice is that it was too speculative to be credited. Instead, the government, like the IJ and the BIA, simply makes no reference to that evidence at all in arguing that the "nexus" rulings must be sustained.[9]
*33 As a result, it seems to me that the majority is unavoidably upholding the "nexus" rulings on a ground of its own making. But, that we may not do, as our job is to review the reasoning of the agency, not to supply it. See Chenery Corp., 332 U.S. at 200, 67 S.Ct. 1760. Thus, per Aldana-Ramos, I would require the BIA to do what it has thus far failed to do-grapple in a reasoned way with the uncontradicted testimony that Villalta-Martinez credibly offered in order to show that she endured the gang's threats at least in part because she was Garcia's "partner." See Aldana-Ramos, 757 F.3d at 18 n.7 ("[T]he government suggests that the BIA could infer that the ... gang subjectively believed that petitioners still had access to more money. That approach, not articulated by the BIA, fails because the BIA never actually drew the inference.").
II.
In consequence of my view of the "nexus" issue, I must now address one last issue that the majority need not reach. As the government notes, the BIA adopted the IJ's decision, and the IJ ruled not only that Villalta-Martinez lost on the "nexus" issue but also that she had failed to meet her burden of showing that the threats that she received from the gang could be attributed to "action or inaction" by the government of El Salvador. See Harutyunyan v. Gonzales, 421 F.3d 64, 68 (1st Cir. 2005) ; 8 U.S.C. § 1101(a)(42). Thus, before we may vacate and remand the petition for review, we must address the IJ's ruling on the "action or inaction" issue.
I do not believe, however, that we may uphold the agency's ruling on the basis of the IJ's ruling on the "action or inaction" issue. And that is so for reasons that are similar to those that lead me to conclude that we may not sustain the agency's "nexus" ruling.
To show the requisite "action or inaction" by the government of El Salvador, Villalta-Martinez put forward the following evidence: a report by the Organisation for Economic Co-operation and Development (OECD) on issues affecting youth in El Salvador and a Reuters article on the relationship between gang violence and youth migration. This evidence may not be enough, in the face of a contrary agency finding, to "compel" the conclusion that she has shown the required tie between the gang's threats and the government of El Salvador's "action or inaction." Touch v. Holder, 568 F.3d 32, 39 (1st Cir. 2009). The IJ, however, did not address either the report or the article in ruling against Villalta-Martinez on this issue. Instead, the IJ's decision merely notes that Villalta-Martinez failed to report to the authorities in El Salvador the incidents she endured at the hands of the gang that she now contends constituted past persecution.
We have never held, however, that asylum seekers must have sought assistance from authorities in order for them to be able to prove that they have suffered past persecution. To the contrary, we have held that "the failure by a petitioner to make ... a report is not necessarily fatal to a petitioner's case if the petitioner can demonstrate that reporting private abuse to government authorities would have been futile." Morales-Morales v. Sessions, 857 F.3d 130, 135 (1st Cir. 2017). Thus, the ground the IJ gave for ruling against Villalta-Martinez on this issue cannot suffice.
Moreover, the agency has failed to address (or even mention) the countervailing *34 evidence that casts doubt on the government of El Salvador's ability to control gang activity within its borders-namely, the OECD report and Reuters article. And that failure is problematic because, while neither the report nor the article directly addresses the police's ability to prevent gang violence, the OECD report does conclude that government anti-gang initiatives are "ineffective[ ]," and the Reuters article notes that "[e]ntire neighborhoods in El Salvador are controlled by street gangs." Cf. Hernandez-Avalos v. Lynch, 784 F.3d 944, 953 (4th Cir. 2015) (holding that government of El Salvador was "unwilling or unable" to control gang violence). Thus, given that we may not sustain an agency's decision on the basis of reasons other than those that the agency provides, Chenery Corp., 332 U.S. at 196, 67 S.Ct. 1760 ; see Aldana-Ramos, 757 F.3d at 18 n.7,[10] the agency should be required to reconsider this aspect of the asylum ruling, too.
III.
For the foregoing reasons, I respectfully dissent as to Villalta-Martinez's asylum claim.

I note that the BIA's decision at a key point states that Villalta-Martinez "has not established past persecution or a well-founded fear of persecution in Mexico on account of an enumerated ground," notwithstanding that she claimed to have suffered persecution only in her home country, El Salvador. This error, to me, does not suggest that it is sensible to make the generous assumption that the BIA must have carefully considered the countervailing evidence of the gang's motivation for the threats, even though the BIA does not reference that evidence in its decision at all.

Of course, the BIA did not rule that the family that she claims to have established with her boyfriend qualifies as a family for purposes of constituting a protected "social group." Instead, the BIA, like the IJ, simply assumed that she had established such a family with him. I thus do not address that issue, as it is not presented by the petition for review and thus supplies no basis for sustaining the only BIA ruling at issue.

Villalta-Martinez did not expressly state that the gang members said anything to indicate that they knew that she was Garcia's partner. But, we did not say in Aldana-Ramos that the petitioners there-who claimed that the men in the unmarked cars were targeting them because of their relationship with their father-expressly stated how they knew that the men in those cars were gang members, whether the men in those cars knew that the petitioners were related to their father, or how they knew that the men in those cars were following them because of their ties to their father. See 757 F.3d at 13. Nor, for that matter, did we say that the men in those cars knew that the petitioners had no money to give them. Id. Nonetheless, we concluded that the petitioners' testimony created an inference of family-based targeting that the BIA had to address. Id.

The three "speculation" cases that the majority relies on are Guerra-Marchorro v. Holder, 760 F.3d 126 (1st Cir. 2014), Giraldo-Pabon v. Lynch, 840 F.3d 21 (1st Cir. 2016), and Khalil v. Ashcroft, 337 F.3d 50 (1st Cir. 2003). In Guerra-Marchorro, however, we explained that the petitioner there did not "either in his brief or in his testimony[ ] directly state that the gang has targeted him ... because of his claimed" protected status. 760 F.3d at 129. By contrast, Villalta-Martinez has directly stated precisely that both in her testimony and in her briefing. In Giraldo-Pabon, moreover, the petitioner's only evidence of a "nexus" consisted of her uncle's admonition " 'not to go out too often' after a cousin's murder and her own belief that another cousin was stabbed because of other family members' involvement in narco-trafficking." 840 F.3d at 25. Thus, the petitioner there offered no evidence that she had been targeted on the basis of a protected ground (there, familial ties), while Villalta-Martinez has done so through her testimony that indicated she knew gang members were extorting Garcia, that they only confronted her after Garcia fled, that they followed her to the second store and directly approached her there, that she had no money to give them, and that they did so because she was Garcia's partner. And, finally, Khalil held that the BIA supportably concluded that the asylum seeker had failed to demonstrate a "nexus" between his alleged persecution (which took the form of the denial of building permits and civil suits brought against him by his tenants) and his Christian faith because he offered "no evidence other than his own speculation" to link the permit denials to his faith and several of those who sued him were also Christians. 337 F.3d at 55. Thus, that case, too, is not one in which there was comparable evidence of specific targeting of the petitioner, such as Villalta-Martinez has put forward here. In fact, I am aware of no case in which we have sustained a BIA ruling finding no "nexus" in the face of a petitioner's comparable evidence of protected-social-group-based targeting when the BIA has not even mentioned that evidence.

The government's only argument with respect to "nexus" does not mention Villalta-Martinez's direct testimony that she was followed from store to store and singled out because she was Garcia's partner, and, instead contends conclusorily-and without citation to any of the "speculation" cases on which the majority relies-that the gang was "simply motivated by a criminal intent to extort money" from all store employees.

The majority asserts that Villalta-Martinez "failed to develop her government inaction argument" on appeal, and thus waives it. Maj. Op. 25-26. But, her brief argues that she "presented documentary evidence to support her assertions regarding gang violence and government unresponsiveness" to the IJ and, on the basis of that evidence, her brief contends that the IJ erred in determining she did not "suffer past persecution." Consistent with my conclusion that Villalta-Martinez did raise the issue in her briefing to us, I note that the government does not contend that Villalta-Martinez waived this issue in her petition for review of the BIA's ruling and instead addresses the merits of the issue by contending that Villalta-Martinez "never offered any evidence to connect the government to any ... harm."