Jose AMILCAR–ORELLANA;  Rebecca Alas–Izquierdo, Petitioners,

v.

Michael B. MUKASEY, Attorney General, Respondent.

No. 08–1563.

United States Court of Appeals, First Circuit.

Submitted Nov. 4, 2008.

Decided Dec. 24, 2008.

Ilana Etkin Greenstein, Jeremiah Fried-man, Maureen O'Sullivan, Harvey Kaplan, Jeanette Kain, Kaplan, O'Sullivan & Fried-man, LLP, L. Manuel Macias, and Office of L. Manuel Macias on brief for petition-ers.

Corey L. Farrell, Attorney, Office of Immigration Litigation, Gregory G. Kat-sas, Assistant Attorney General, Civil Divi-sion, U.S. Department of Justice, Anthony W. Norwood, Senior Litigation Counsel, on brief for respondent.

Before LYNCH, Chief Judge, SELYA and BOUDIN, Circuit Judges.

LYNCH, Chief Judge.

Jose Amilcar–Orellana and Rebecca Alas–Izquierdo, both natives and citizens of El Salvador, petition for review of a decision of the Board of Immigration Ap-peals ("BIA") denying their application for asylum, withholding of removal, and pro-tection under the Convention Against Tor-ture ("CAT"). Amilcar–Orellana seeks re-lief based upon his fear of retribution from members of a notorious gang in El Salva-dor because he cooperated with law en-forcement officials in the United States both by providing investigators with infor-mation relating to an arson he witnessed in East Boston and because he testified against two members of the gang before a grand jury regarding that arson. Alas–Izquierdo is Amilcar–Orellana's wife, and her claim for relief is derivative to his. We deny their petition.

## I.

Amilcar–Orellana first came to the Unit-ed States, illegally, in 1994 and lived with his cousin in East Boston. He found em-ployment at an Italian restaurant, where he worked as a cook until 2000.

In January 2000, Amilcar–Orellana re-turned home from work around midnight and ordered Chinese takeout. After twen-ty-five minutes, he heard his apartment building's main door open and went down-stairs thinking it was the deliveryman. Instead, Amilcar–Orellana saw two men, X and Y (known gang members), pour a liq-

uid in the entryway of the apartment building and heard X tell Y to throw a match on the floor.[1] He did; a fire started.[2]

Amilcar–Orellana ran back to his apartment and called the police. He then warned his neighbors about the fire and helped one neighbor's children escape the burning building safely.

When the police arrived, Amilcar–Orellana told them that he had seen X and Y start the fire, and he gave the police their addresses. A few days later, X confronted Amilcar–Orellana, said that he had seen him when setting the fire, and asked him whether he had talked to the police. Amilcar–Orellana, fearing retribution, told X that he had not spoken with the police.

Amilcar–Orellana eventually testified against X and Y before a grand jury regarding the arson he had witnessed. Several days later, two men came looking for him at the restaurant where he worked. He was not working that day, but his brother was. The two men made threats against Amilcar–Orellana. After this incident, Amilcar–Orellana decided to move to El Salvador permanently.

On April 23, 2001, Amilcar–Orellana returned to El Salvador. He initially lived with his sister, helping her manage her bakery. Shortly after his return, he met and married Alas–Izquierdo.

Amilcar–Orellana lived well for a few months in El Salvador. Meanwhile, back in East Boston, X and Y sent fellow gang members to look for Amilcar–Orellana and discovered that he had moved to El Salvador. X and Y were never prosecuted for the arson and were ultimately deported to El Salvador.

By the end of 2001, Amilcar–Orellana started receiving death threats from X and Y in El Salvador. On one occasion, two men looking for Amilcar–Orellana confronted his nephew in El Salvador. They told his nephew that Amilcar–Orellana would pay with his life for what he had done in Boston. Amilcar–Orellana never reported this incident to the authorities in El Salvador because he believed that they would be unable to prevent gang members from carrying out the threat. The intensity of the death threats against Amilcar–Orellana increased over time.

In April 2002, Alas–Izquierdo became pregnant, and Amilcar–Orellana decided it was no longer safe for them to live in El Salvador. Alas–Izquierdo obtained a visa to enter Mexico, but Amilcar–Orellana did not. In June 2002, they traveled separately to Mexico. Amilcar–Orellana paid a smuggler to help him enter Mexico, and he was reunited with his wife in Acapulco. They then traveled together to the United States with the assistance of the same smuggler. On June 15, 2002, after a ten-hour walk through the desert, they entered the United States near Naco, Arizona. They were then apprehended by United States border patrol agents.

Amilcar–Orellana gave the United States immigration officials a false name and told them that he and his wife were Mexican. He and Alas–Izquierdo were

---

1. We see no need to provide greater identifying information, given the nature of this case.

2. The police report regarding the arson states that X and Y started the fire to kill a particular individual living in the building over an undisclosed incident that occurred several days earlier. At least seven people were living there at the time, and there is nothing in the record to indicate that X and Y were targeting Amilcar–Orellana with the fire. The feud between the gang members and Amilcar–Orellana stems only from his subsequent cooperation with the police and testimony before the grand jury, not some preexisting dispute.

then transferred to the custody of the Mexican authorities. The two tried to convince the Mexican authorities that they were Mexican. But the Mexican authorities suspected that they were Central American and returned them to the United States immigration officials. Amilcar–Orellana eventually told the United States immigration officials their true identities, and the two were then held at a detention facility in Arizona for approximately two months until Amilcar–Orellana's aunt helped them post bail.

Amilcar–Orellana and Alas–Izquierdo were served with Notices to Appear ("NTAs") on June 20, 2002, charging them as removable under 8 U.S.C. § 1182(a)(6)(A)(i). They appeared separately in Immigration Court in Florence, Arizona on June 24 and 25, 2002, and their hearings were continued to give them an opportunity to retain counsel. On November 6, 2002, they filed a motion to change venue to the Immigration Court in Boston, Massachusetts, which an Immigration Judge ("IJ") granted. A removal hearing before an IJ in Boston was scheduled for January 8, 2003, and notice of this hearing was sent by mail to Amilcar–Orellana and Alas–Izquierdo. The two, however, failed to appear for their hearing and were ordered removed in absentia on January 14, 2003.

On April 9, 2003, Amilcar–Orellana and Alas–Izquierdo filed a motion to reopen and rescind the in absentia order of removal. An IJ granted that motion on June 30, 2003. On August 14, 2003, they admitted the factual allegations contained in the NTAs and conceded removability. Amilcar–Orellana filed an application for asylum and related relief, naming Alas–Izquierdo as a derivative applicant, on February 24, 2004.

They appeared for their removal hearing before an IJ on June 20, 2006. In an oral decision following the hearing, the IJ rejected their application for asylum, withholding of removal, and relief under the CAT.

The IJ rejected their asylum claim because she found that Amilcar–Orellana's claim of past persecution based on his grand jury testimony was not on account of his membership in a social group. Rather, she found that Amilcar–Orellana had not been targeted by gang members generally but by "two people . . . who have a grudge against [him]," recognizing that he could not qualify for asylum based on retribution over purely personal matters. Because she found that Amilcar–Orellana had failed to carry his burden on his asylum claim, she also denied his request for withholding of removal. Finally, the IJ also rejected Amilcar–Orellana's claim for relief under the CAT because she found that he had failed to establish that the Salvadorian government was unwilling or unable to prevent members of the gang from torturing him. She noted that Amilcar–Orellana and Alas–Izquierdo were not eligible for voluntary departure.

On April 15, 2008, the BIA adopted and affirmed the IJ's decision. The BIA did not reach the issue of whether the IJ had correctly found that petitioners fell within an exception to the one-year filing deadline for asylum. Even assuming that the time bar did not apply, the BIA held that Amilcar–Orellana had not established past persecution or a well-founded fear of future persecution on account of one of the statutory grounds. The BIA rejected Amilcar–Orellana's argument that he had suffered persecution on account of his membership in a particular social group of "non-confidential informants who have identified individual gang members, and who have given information regarding specific criminal gang activity to law enforcement officials." Rather, as the IJ had found, the BIA

determined that Amilcar–Orellana's fear of persecution was personal to two individuals who sought retribution. The BIA then added a broader observation that even if Amilcar–Orellana's fear of persecution were not purely personal, the social group of informants, whether confidential or non-confidential, lacked sufficient social visibility so as to constitute a social group. This was because the record did not show that informants suffered a higher degree of violence than other segments of the population in El Salvador.

The BIA also rejected a new argument made on appeal that by testifying against X and Y in the United States, Amilcar–Orellana expressed "an anti-gang, anti-crime, pro-establishment, and pro-rule of law political opinion." Despite Amilcar–Orellana's failure to raise this argument before the IJ, the BIA held that his single act of testimony was not political expression and that he did not show that the gang members were aware of any actual political opinion expressed thereby or that they imputed a political opinion to him and targeted him on that basis.

## II.

■ Amilcar–Orellana challenges the BIA's rejection of his two theories of eligibility for asylum—persecution based on his actual or imputed political opinion and persecution based on his membership in a social group.[3] In addressing these arguments, we review the BIA's factual findings under the deferential substantial evidence standard. *See Khan v. Mukasey,* 541 F.3d 55, 57 (1st Cir.2008). Under the substantial evidence standard, "[t]he BIA's factual findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

■ To establish eligibility for asylum, the applicant bears the burden of proving that he is a "refugee." *Id.* at 58. To carry his burden, the applicant must demonstrate "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Within wide limits, whether the applicant has met his burden is ordinarily a question of fact, which we review under the substantial evidence standard. *Khan,* 541 F.3d at 58.

Amilcar–Orellana first argues that the BIA erred in finding that he had not demonstrated a well-founded fear of persecution on account of his actual or imputed political opinion. Specifically, he contends that his "decision to report criminal gang activity to law enforcement personnel, and to cooperate with police officers and the courts in bringing gang members to justice, clearly constitutes an expression of anti-gang, pro-rule of law political opinion." We need not address the issue of whether Amilcar–Orellana waived or forfeited this argument; the BIA met the issue head-on, and we find the argument, in any event, is without merit.

**3.** As a preliminary matter, Amilcar–Orellana argues that the BIA should not have adopted the IJ's decision because it contains internal inconsistencies. Specifically, he points to a portion of the IJ's opinion where she states: "The respondents have an objective basis for a fear of persecution in El Salvador because the gangs are prevalent throughout the entire country.... [T]he Court cannot find that this fear is objectively based...." This argument, however, is misleading because the IJ amended her opinion. Indeed, as the BIA itself recognized, "the record includes an amended version of the decision, on which the Immigration Judge made various handwritten corrections of minor typographical errors, including the inconsistency referenced by the respondents." Because the IJ corrected any inconsistency in her opinion, Amilcar–Orellana's preliminary argument fails.

Because people report criminal conduct to law enforcement for various reasons, the mere act of giving a statement to the police or testifying before a grand jury does not compel a conclusion that it is an expression of political opinion. *Cf. INS v. Elias–Zacarias,* 502 U.S. 478, 481–82, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (recognizing that a person's resistance to being recruited for military service by a guerrilla organization does not necessarily involve the expression of a political opinion). Based upon the particular facts surrounding the asylum applicant's decision to report a particular crime, however, he might be able to demonstrate that he was targeted because of his actual or imputed political opinion. *Cf. e.g., Grava v. INS,* 205 F.3d 1177, 1181 (9th Cir.2000) (recognizing that whistleblowing against corrupt government officials might result in persecution on the basis of the applicant's political opinion).

■ Yet here, as the BIA recognized, the record contains no evidence that Amilcar–Orellana's decision to testify against X and Y in the arson was motivated by a political opinion. Indeed, his testimony before the IJ was to the effect that he gave a statement to the police simply because he felt that it was "the correct thing" to do. And his decision to testify before the grand jury seems to have been motivated by a sense of duty as the only witness to the arson, not a desire to express an "anti-gang, pro-rule of law political opinion." These are commendable instincts but do not dictate the conclusion that Amilcar–Orellana's actions were motivated by his actual political opinion.

Moreover, the record does not show that members of the gang imputed any political opinion to Amilcar–Orellana on the basis of his statements to the police or testimony before the grand jury. X and Y threatened Amilcar–Orellana both in Boston and later in El Salvador "for what [he] had done ... in Boston," not for any political opinion expressed through his actions. Substantial evidence supports the BIA's conclusion that Amilcar–Orellana did not show a well-founded fear of persecution on the basis of his actual or imputed political opinion.

■ Amilcar–Orellana secondly argues that the BIA erred in finding that he had not established a well-founded fear of persecution on account of his membership in a social group. He claims membership in the social group of "non-confidential informants who have identified gang members and given information regarding criminal gang activity to law enforcement officials." The BIA rejected this argument because Amilcar–Orellana "has not been targeted by gangs generally, but by 'only individuals who are seeking particularized retribution against him [for] being an informer to the police or a witness to a crime who provided information to prosecute that crime.'" (Alteration in original; quoting opinion of the IJ.)

■ The BIA's determination is supported by the evidence. The record supports the conclusion that Amilcar–Orellana's fear of persecution stems from a personal dispute with X and Y, not his membership in a particular social group. Fear of retribution over personal matters is not a basis for asylum under the Immigration and Nationality Act. *Sompotan v. Mukasey,* 533 F.3d 63, 71 (1st Cir. 2008); *Romilus v. Ashcroft,* 385 F.3d 1, 6 (1st Cir.2004) ("The [Act] is not intended to protect aliens from violence based on personal animosity."). We deny the petition based on the BIA's narrower ruling. We have no need to reach the broader questions regarding the BIA's use of a social visibility test in its definition of a particular social group.

■ Because Amilcar–Orellana has failed to meet the lower burden required for asylum, he cannot satisfy the more rigorous standard for withholding of removal. *See Khan,* 541 F.3d at 58.

■ Finally, Amilcar–Orellana contests the BIA's rejection of his claim for relief under the CAT. To obtain protection under the CAT, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). The torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 208.18(a)(1). We review whether an applicant has demonstrated eligibility for relief under the CAT for substantial evidence. *See Limani v. Mukasey,* 538 F.3d 25, 32 (1st Cir.2008).

■ Amilcar–Orellana argues that the police in El Salvador are "wholly incapable of protecting men like [Amilcar–Orellana] from retribution by gang members" and also "willfully turn a blind eye to, and at times participate in," gang-related criminal acts. But the IJ found, and the BIA agreed, that the record shows "the government in El Salvador is trying as best it can[ ] to control the gangs."

Substantial evidence supports this conclusion. The 2005 State Department country condition report for El Salvador, which the IJ reviewed, indicates that El Salvador has established an "Anti–Gang Task Force with 333 military personnel deployed in high crime areas," and other documents in the record describe the Salvadorian government's efforts to combat gang activity, prosecute offenders, and punish corruption within its own police force. *See Flores–Coreas v. Mukasey,* 261 Fed.Appx. 287, 292 (1st Cir.2008) (per curiam) ("[T]here is evidence that gang violence constitutes a serious problem in El Salvador, but that

the police attempt with some success to prevent that activity. While that sort of stand-off may be of scant solace to the citizenry, it plainly supports an inference that the government neither condones gang violence nor is helpless in the face of it." (footnotes omitted)); *cf. Ortiz–Araniba v. Keisler,* 505 F.3d 39, 43 (1st Cir.2007) (recognizing that the Salvadorian "government's willingness and ability to prosecute and incarcerate particular gang members" supported an inference of "its ability and willingness to control the gang.").

### III.

The petition is *denied.*