# United States Court of Appeals
## For the First Circuit

No. 17-1304

WENDY CAROLINA SOSA-PEREZ, CHRISTHIAN JASSELL DIAZ-SOSA,
EMIR FABRIZIO DIAZ-SOSA,

Petitioners,

v.

JEFFERSON B. SESSIONS, III,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Selya, and Stahl,
<u>Circuit Judges</u>.

<u>Traci N. Firicano</u>, with whom <u>Sheri F. Murray</u> was on brief,
for petitioners.

<u>Anna Juarez</u>, Office of Immigration Litigation, with whom
<u>Melissa K. Lott</u>, Trial Attorney, Office of Immigration Litigation,
Civil Division, United States Department of Justice, <u>Chad A.
Readler</u>, Acting Assistant Attorney General, Civil Division, and <u>M.
Jocelyn Lopez Wright</u>, Senior Litigation Counsel, Office of
Immigration Litigation, were on brief, for respondent.

February 28, 2018

**BARRON**, **Circuit Judge**. Wendy Sosa-Perez (Sosa), a Honduran national, petitions for review of the Board of Immigration Appeals' (BIA) dismissal of her appeal from the denial of her application for asylum and withholding of removal for herself and, derivatively, her two minor children. She does so on the basis of the violent attack that she claimed to have suffered in that country in 2013 and the numerous violent attacks that she claimed other members of her family suffered over the course of more than three decades. Given the deference that we owe the BIA's factual findings, we deny the petition for review.

## I.

We first review the basic legal background. We then describe the facts relevant to the issues before us, as well as the BIA's ruling and the ruling by the Immigration Judge (IJ), which the BIA adopted.

## A.

To be eligible for asylum, an applicant bears the burden of proving by a preponderance of the evidence that she is "unable or unwilling to return to" her home country because she has a "well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(b)(1)(B)(i). If the applicant can show that she has faced persecution in the past, then she has established a "rebuttable presumption of a well-founded fear of future persecution." Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st Cir.

2005).  Unless that presumption is overcome, the applicant's past persecution supplies the basis for finding that she has a well-founded fear of persecution and is potentially eligible for asylum. Id.

If the applicant fails to demonstrate that she has faced past persecution, she may still demonstrate a well-founded fear of future persecution in either of two ways.  She may demonstrate that she has a genuine and objectively reasonable fear of suffering individualized persecution in the future, or she may "demonstrat[e] 'a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of' a protected ground." Decky v. Holder, 587 F.3d 104, 112 (1st Cir. 2009) (quoting 8 C.F.R. § 1208.13(b)(2)(iii)(A)).

There is no precise definition of "persecution," but it must "add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment." Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005).  In addition, the asylum seeker must show that the persecution has a "nexus" to one of the statutorily enumerated protected grounds, such as membership in a "social group," like a nuclear family.  Guerra-Marchorro v. Holder, 760 F.3d 126, 128 (1st Cir. 2014); 8 U.S.C. § 1101(a)(42); see also Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008) ("Kinship can be a sufficiently permanent and distinct characteristic to serve as

the linchpin for a protected social group within the purview of the asylum laws."). Finally, the asylum seeker must also show that the harm is attributable to the action or inaction of the government of her home country. Morales-Morales v. Sessions, 857 F.3d 130, 135 (1st Cir. 2017).

Even if an asylum applicant is not eligible for asylum, she still may be entitled to receive what is known as withholding of removal, which provides her protection from being removed from the United States without offering all of the other benefits that come with receiving asylum. 8 U.S.C. § 1231(b)(3)(A); Soeung v. Holder, 677 F.3d 484, 487 (1st Cir. 2012) (explaining difference between asylum and withholding of removal). To be eligible for withholding of removal, however, the applicant must prove by a "clear probability," Lopez Perez v. Holder, 587 F.3d 456, 463 (1st Cir. 2009), that her "life or freedom would be threatened in [the country to which she would be removed] because of [her] race, religion, nationality, membership in a particular social group, or political opinion" if she were returned there. 8 U.S.C. § 1231(b)(3)(A); Marroquín-Rivera v. Sessions, 861 F.3d 7, 8 (1st Cir. 2017). Because the "clear probability" standard is more onerous than the "well-founded fear" standard, an alien who fails to meet the asylum standard will necessarily fail to meet the withholding of removal standard. Amilcar-Orellana v. Mukasey, 551 F.3d 86, 92 (1st Cir. 2008).

**B.**

Sosa and her two children, Christhian and Emir Diaz-Sosa, were apprehended by the Department of Homeland Security while entering the United States without inspection on June 14, 2014. They conceded their removability, and Sosa thereafter submitted a timely application for both asylum and withholding of removal. Sosa listed Christhian and Emir as derivative applicants on her asylum and withholding of removal applications.[1]

At her removal proceedings before the IJ, Sosa testified and submitted a declaration in support of her applications for asylum and withholding of removal. Through that evidence, she described that she had been the victim of a violent attack in 2013, while she was living in Honduras.[2] Specifically, she stated in her declaration and testimony that she was "robbed at knife point" in that incident and that this robbery came after she had been "receiving threatening calls from the local gangs," which she described in her declaration as having been made "anonymously" and as containing threats "to kill her and her sons if she did not pay

---

[1] Sosa also initially indicated that she would file applications for Special Immigrant Juvenile adjustment of status for her two minor children, but never did so. The BIA thus deemed these claims waived, and Sosa does not challenge that determination on appeal.

[2] Sosa's written statement indicated that this event occurred in 2014. However, as she was not given an opportunity to explain this inconsistency, the IJ did not hold this inconsistency against her.

[the callers] money."  In her testimony regarding that 2013 incident, Sosa further explained that the robbers "manhandled" her and "wanted to rape [her], but . . . somebody else showed up. [She] was . . . spared that . . . and [she] got home very nervous, but nothing happened."

Through her evidence at the removal proceeding, Sosa also recounted the history of violent incidents that a number of her family members -- including a great uncle, two uncles, a grandmother (who was threatened with a machete), an aunt, and a cousin -- had suffered.  She described that history as follows.

In the early 1980s, "local gangs" robbed one of Sosa's uncles, took his horse, and shot him in the head, killing him. Two years later, her great-uncle, who had witnessed the murder of her uncle, was "found . . . murdered."

More than a decade later, in 1999, a second of Sosa's uncles "was attacked by a gang while standing outside her grandmother's home."  During that incident, "[t]he gang members robbed [her uncle of] his chain and beat him up very badly."

During this incident, one of this uncle's attackers also threatened her grandmother with a machete and threatened to decapitate her uncle.  The uncle and grandmother reported this incident to the police in Honduras and provided the police with "as many names and aliases" of the assailants as they could.  The

- 6 -

police took the report, but "did nothing to help or protect" her uncle and grandmother.

In addition, more than a decade after this incident involving her uncle and grandmother, her aunt and cousin in March of 2011 traveled to Honduras from the United States to visit her grandmother. On the second day of their visit to Honduras, they were "attacked and robbed" by "[s]ome men." The attackers fled when a neighbor fired his gun into the air.

Finally, in 2014, after Sosa had been the victim of the 2013 robbery, her grandmother's house was broken into. Sosa testified that she did not know who the assailant was.

Sosa testified that she has only two family members remaining in Honduras. They are her grandmother, who Sosa testified has fortified her house with electrified barbed wire, and her uncle, who she testified has, since the 2011 incident in which her aunt and cousin were robbed while visiting Honduras, left the region in Honduras where Sosa's family lives.

As to why these attacks on her family had occurred, Sosa stated in her declaration that, "I am not sure why but my family has always been targeted by the local gangs." She added that "[t]he local gangs have always tried to rob my family, physically harm us and even kill us." Sosa also stated that, "I don't know why the gangs have always targeted my family[,] they just have . . . . I think it may be because we are considered [a] wealthy

family in Honduras because we have always owned a lot of land and had big houses."  Finally, in her testimony, when asked why her family had been "attacked so many times," Sosa answered: "[P]erhaps out of jealousy.  I don't know really."

Sosa contends to us, as she did to the IJ and the BIA, that this evidence -- cumulatively -- sufficed to demonstrate that she suffered past persecution in 2013 on account of her membership in her family and that this past persecution gives rise to a presumption of future persecution that the government has not rebutted.  She also contends, separately, that, in light of the violence that members of her family have endured over the years in Honduras, she has a well-founded fear of future persecution on account of her familial ties, even if the 2013 incident in which she was victimized does not itself constitute an instance of past persecution that could give rise to a presumption of her having a well-founded fear of future persecution.

The IJ denied Sosa's applications for asylum and withholding of removal and ordered Sosa and her minor children removed.  The IJ reasoned that the 2013 attack did not constitute persecution.  In so ruling, the IJ concluded that Sosa's "brief description of the incident [did] not indicate that she was physically injured" and the record did not "suggest that the [2013] attack was anything more than an isolated crime committed in a country with widespread violence," as she had failed to establish

- 8 -

that the attack was on account of her family membership. Accordingly, the IJ concluded that Sosa was not entitled, on the basis of the 2013 attack, to a presumption of a well-founded fear that she would face future persecution. See Harutyunyan, 421 F.3d at 67.

The IJ also found that, even apart from the 2013 attack, Sosa had not met the requirements to show that she was at risk of future persecution on account of her family membership. The IJ ruled that she had not demonstrated an objectively reasonable fear of future persecution because she had "not established that any past or future harm is (or would be) on account of her social group membership," since she had provided no evidence that "family membership was 'at the root' of [the] harm" she and her family members experienced. Indeed, the IJ concluded, Sosa "even acknowledged that she does not know why her family has been targeted by the gangs." In consequence, the IJ concluded, Sosa had "merely shown that multiple family members had negative experiences, without establishing that those experiences are causally linked to family membership."

Finally, the IJ concluded that Sosa had, for the same reasons, not demonstrated that there was a "pattern or practice" of persecution of her family that would support a conclusion that she had an objectively reasonable fear of persecution on account of her membership in her family.

The BIA adopted the reasoning of the IJ.  The BIA explained that the attack in 2013 did not constitute persecution. The BIA also reasoned that Sosa had not demonstrated that she had a "well-founded fear of [future] persecution" because she had not demonstrated that the mistreatment her family members experienced was on account of their family membership.  Lopez de Hincapie v. Gonzales, 494 F.3d 213, 217-18 (1st Cir. 2007).

Sosa now timely petitions for review of the BIA's dismissal of the appeal from the IJ's denial of her asylum and withholding of removal claims on the ground that the BIA's ruling is not supported by substantial evidence.  She also contends the BIA violated the Fifth Amendment's Due Process Clause by refusing to consider certain portions of her evidence and arguments.

## II.

When "the BIA conducts a de novo review of the record, independently validates the sufficiency of the evidence, and adopts the IJ's findings and conclusions, the IJ's findings become the BIA's."  Laurent v. Ashcroft, 359 F.3d 59, 64 n.3 (1st Cir. 2004).  Our review of those findings is for "substantial evidence," which means we must "defer to those findings of fact that are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'"  Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012) (quoting Lobo v. Holder, 684 F.3d 11, 16 (1st Cir. 2012)).  We will therefore sustain the findings

- 10 -

"unless the record is such as to compel a reasonable factfinder to arrive at a contrary determination."  Palma-Mazariegos v. Gonzales, 428 F.3d 30, 34 (1st Cir. 2005).

The BIA, in adopting the IJ's decision, determined that among the reasons that Sosa's asylum claim failed was that she had failed to satisfy her burden of "establishing the requisite nexus between the alleged harm she fears and her membership in a particular social group."  We focus on that finding here in order to determine whether it is supported by substantial evidence or, put otherwise, to determine whether a contrary finding is compelled on this record.

We start with Sosa's contention that she is entitled to a presumption of a well-founded fear of future persecution because she suffered past persecution in consequence of the attack that she suffered in 2013.  Sosa is correct that a nuclear family is a protected social group.  See Aldana-Ramos v. Holder, 757 F.3d 9, 15 (1st Cir. 2014).  She is also correct that, to meet her burden to show the requisite "nexus" between her familial ties and this attack, she need not show that her membership in her family was the sole reason that she was targeted in that attack.  She need only show that her membership in that protected group was a "central reason" that she was targeted.  Sugiarto v. Holder, 586 F.3d 90, 95 (1st Cir. 2009) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

Here, the BIA, in rejecting Sosa's asylum claim, adopted the finding of the IJ that, considering the record as a whole, Sosa had not put forth evidence sufficient to "suggest that the attack was anything more than an isolated crime committed in a country with widespread violence," and thus that she had failed to establish that the incident was related to her family membership. And that finding is supported -- even if it is not compelled -- by the record.

The record indicates that the attack in 2013 followed Sosa's receipt of calls from what she described as members of "local gangs." Sosa did not, however, either in her testimony or her declaration, state that she knew who the assailants were in the 2013 incident or what their affiliation was. Nor does she suggest otherwise in her briefing to us. She also offers no direct evidence to support her assertion that the assailants knew that she was a member of the family that she alleges they were targeting, let alone that they attacked her on that basis.

She nevertheless argues that the evidence that multiple members of her family have been the victims of violent attacks over many years, including by members of local gangs, provided "sufficient evidence for a reasonable person to believe that the harm" she suffered in 2013 was on account of her kinship status. But, even assuming the record provides a basis for the agency to

so conclude, we do not see how the record could be read to <u>compel</u> that conclusion.

As the BIA and IJ supportably concluded, there is "rampant crime" and "pervasive societal violence" in Honduras, which has "far reaching effects on many segments of the population." And, as both the IJ and the BIA noted, Sosa admitted that she did not know the motivation underlying many of the attacks on her family members.

We note in this regard that, when asked about the attack on her uncle in 1980, she testified that "with that uncle, we don't know whether it was simply a robbery or it was part of revenge against the family." As to her great uncle, who was killed two years later, she does not explain who murdered him, just that her "family found [him] murdered." With regard to the 1999 attack on her uncle, she testified that "he . . . was robbed" by individuals who "had their faces covered." She did not claim, however, to know the robber's identity or affiliation, thereby making it hard to rely on her testimony to attribute that attack to a family-based motivation. And when asked about the attack on her aunt and cousin during their visit to Honduras in 2011, she testified merely that "some individuals" robbed them. Finally, with respect to the break-in at her grandmother's home, which post-dates the attack she suffered in 2013, Sosa testified that "we don't know" who had tried to break into her grandmother's house.

In light of these aspects of the record, we do not see how the fact that over the course of three decades a number of other members of her family were subjected to acts of violence can in and of itself compel (even assuming such a fact permits) the conclusion that those prior attacks on members of her family were themselves made on account of the victims' membership in Sosa's family, rather than that they were a "series of highly unfortunate criminal incidents occurring within a culture of widespread societal violence." And that in turn means that we cannot say that the record compels a different conclusion as to what motivated the 2013 attack.

This conclusion accords with our recent decision in Ruiz-Escobar v. Sessions, No. 17-1539, 2018 WL 671125 (1st. Cir. 2018). In Ruiz-Escobar, the petitioner alleged that he had been the victim of past persecution on account of his membership in his family. Id. at *1. As support for this claim, he presented evidence that various members of his family had been killed, and that he himself had been the victim of a break-in and threats. Id. at *1-2. But, like here, Ruiz-Escobar offered no evidence that his family members had been killed based on their family membership, rather than for reasons unrelated to their family membership. Id. at *5-6. Indeed, like Sosa, he acknowledged that he "had no idea who [his attackers] were[,]" and offered no basis for his assertion as to the reason for his family members' deaths.

- 14 -

*Id.* at \*5.  We thus concluded that Ruiz-Escobar failed to demonstrate a nexus between his past mistreatment and his familial membership, and so we held that he had not demonstrated that he had suffered past persecution.  *Id.*

In pressing the case that the BIA did err, Sosa relies on *Aldana-Ramos*.  757 F.3d 9.  There, we determined that the BIA's "nexus" ruling could not be sustained because the BIA failed to even mention, let alone engage with, evidence critical to the asylum seekers' argument that they had demonstrated that their persecution was on account of their family membership.  *Id.* at 18.  But, Sosa has presented no evidence analogous to the evidence of targeting by a specific gang on account of membership in a particular family that the petitioners put forward in *Aldana-Ramos*.  And, unlike in *Aldana-Ramos*, the BIA in this case, by adopting the IJ's decision, fully engaged with the arguments and evidence that Sosa did present.

Sosa does also contend that, even if the 2013 attack on its own did not constitute past persecution on account of her membership in her family, the tragic experiences of her family members, taken together, compel the conclusion that she has a "well-founded fear" of future persecution.  But, as we have just explained, Sosa has failed to identify evidence in the record that would compel -- even if the evidence she did put forward might permit -- a finding that the attacks on her family members were

- 15 -

connected, let alone compel the conclusion that the assailants in these incidents targeted her family members on account of the family to which they belonged. And as the IJ correctly concluded, "[w]here a petitioner presents 'no evidence other than his own speculation' to forge the statutorily required 'link,' no nexus is established." See Guerra-Marchorro, 760 F.3d at 129. That conclusion is also consistent with our recent decision in Ruiz-Escobar. 2018 WL 671125 at *7.

Finally, Sosa separately argues that the record suffices to establish that there is a "pattern or practice" in Honduras of persecuting her family, and thus that she fears future persecution there. See 8 C.F.R. § 1208.13(b)(2)(iii)(A). To make that showing, she must put forth evidence to demonstrate that there is a "regular and widespread persecution creating a reasonable likelihood of persecution of all persons in the group." Ye v. Lynch, 845 F.3d 38, 45 (1st Cir. 2017) (quoting Rasiah v. Holder, 589 F.3d 1, 5 (1st Cir. 2009)).

But the BIA adopted the IJ's ruling that Sosa had not met her burden in that regard, and the record does not compel the contrary conclusion that the attacks that she describes were motivated -- in significant part -- by the fact that the victims were members of her family. In arguing otherwise to us, Sosa does point to the evidence in the record that members of her family

- 16 -

have taken steps to avoid being victimized.[3]  But, the IJ considered

that evidence and supportably found that the record failed to

establish that there was "regular and widespread persecution

creating a reasonable likelihood of persecution of all persons in

the group."  Gilca v. Holder, 680 F.3d 109, 117 (1st Cir. 2012)

(quoting Rasiah, 589 F.3d at 5).

         For these reasons, Sosa's challenge to the denial of her

asylum claim fails.[4]  And so, for identical reasons, must her

---

[3] In her reply brief, Sosa relies extensively on a series of
recent cases from the Fourth Circuit to contend that the BIA erred
in denying her claim based on kinship persecution.  To the extent
that this raises new arguments, they are waived.  Waste Mgmt.
Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000).  In
any event, the cases that she relies on do not alter our conclusion
that, on this record, Sosa has failed to demonstrate that the
evidence she put forth regarding the attacks against members of
her family compels the conclusion that the attacks were on account
of family membership.  In each of the Fourth Circuit cases that
the she relies on there was some evidence in the record tying the
petitioner's persecution to their kinship or some failure of the
BIA to engage with the petitioner's arguments.  See Zavaleta-
Policiano v. Sessions, 873 F.3d 241, 248-50 (4th Cir. 2017)
(remanding to BIA based on BIA's erroneous holding that the
petitioner had not established a nexus because the BIA had ignored
evidence that the petitioner had been threatened because her father
had fled the gang); Cruz v. Sessions, 853 F.3d 122, 129 (4th Cir.
2017) (holding the BIA erred in determining that a petitioner had
not established a nexus between persecution and her family
relationship where the record showed that petitioner was targeted
after she threatened to file a police report accusing a local
criminal of responsibility for a family member's disappearance);
Hernandez-Avalos v. Lynch, 784 F.3d 944, 950 (4th Cir. 2015)
("Hernandez's relationship to her son is why she, and not another
person, was threatened with death if she did not allow him to join
[a gang], and the gang members' demands leveraged her maternal
authority to control her son's activities.").
    [4] In a Rule 28(j) letter, Sosa argues that the fact that her
aunt's asylum claim based on her membership in the same family was

- 17 -

challenge to the denial of her withholding of removal claim. *Amilcar-Orellana*, 551 F.3d at 92.

### III.

We turn next to Sosa's due process claim. Sosa argues that the decision by the BIA was "arbitrar[y]" because a footnote to a section of its opinion discussing Sosa's failure to provide details about the attack in 2013 stated that "to the extent that the lead respondent's counsel makes statements on appeal that are not supported by citations to the record on appeal, the statements of counsel are not evidence and are not entitled to any evidentiary weight." There is no doubt that aliens are entitled to due process in our immigration courts, *see* Pena-Muriel v. Gonzales, 489 F.3d 438, 443 (1st Cir. 2007), and we afford de novo review to determinations regarding the "contours" of the process due to them, Eze v. Gonzales, 478 F.3d 46, 47 (1st Cir. 2007).

The government characterizes this footnote as merely stating the "noncontroversial point that statements and arguments by counsel [are] not themselves evidence in the case." See I.N.S. v. Phinpathya, 464 U.S. 183, 188 n.6 (1984) (concluding that

---

granted (and, according to Sosa, was not opposed by the government) in 2015 demonstrates that the BIA's determination in this case was in error. But, while Sosa raised the fact that her aunt's asylum claim was granted before the BIA, she did not do so on appeal to this Court until after oral argument. This argument is therefore waived. See United States v. DeMasi, 40 F.3d 1306, 1320 n.14 (1st Cir. 1994).

"[c]ounsel's "unsupported assertions" did not establish facts sufficient to support eligibility for suspension of deportation); United States v. Castro-Davis, 612 F.3d 53, 68 (1st Cir. 2010) ("[A]rguments and statements of counsel are not evidence."); Matter of Ramirez-Sanchez, 17 I. & N. Dec. 503, 506 (BIA 1980) ("[C]ounsel's arguments are not evidence.").  But, even if we were to accept Sosa's characterization of the footnote, she has not pointed to any evidence that was unfairly excluded from the BIA's analysis, nor any argument that was overlooked that would support a finding that she did not receive a "fair opportunity to be heard."  Pena-Muriel, 489 F.3d at 443.  Nor does she contend that any content of the record was itself excluded from consideration. She has thus not demonstrated that the alleged error resulted in prejudice to her.  Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008) (citing Shmyhelskyy v. Gonzales, 477 F.3d 474, 482 (7th Cir. 2007)).  Accordingly, this claim fails.

## IV.

For the foregoing reasons, the petition for review is **denied**.